**People of the State of Illinois, Plaintiff-Appellee,
v. Larry B. Taylor, Defendant-Appellant.**

**Gen. No. 53,486.**

First District, First Division.

March 16, 1970.

Rehearing denied April 6, 1970.

Sheldon M. Schapiro, of Evanston, for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Michael D. Stevenson, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

In a bench trial defendant was found guilty of the offenses of rape and deviate sexual assault. He was sentenced to the penitentiary for a term of 8 to 20 years. Defendant admitted the acts but asserted consent of the prosecutrix. On appeal he contends (1) that he was not proved guilty beyond a reasonable doubt; (2) prejudicial trial errors were committed; and (3) that the State failed to prove venue.

On September 18, 1967, at about 8:30 or 8:45 p. m., the prosecutrix, age 16, was walking alone across the Ford City parking lot in Chicago to meet her boyfriend. Defendant pulled up in an automobile and asked what her name was and how long she had lived in the neighborhood, and she answered him both times. He then told her he had a gun and that she should get inside the car or he would shoot her. She saw an object in the crook of his arm that she took to be a gun. No one else was in the vicinity at that time. She testified, "I stood there. I didn't know exactly what I should do. He told me to walk around in front of the car and get inside, otherwise he would shoot me. . . . He said, 'Just get in the car and shut up.' And he said, 'There is no need of screaming or yelling or running anywhere because no one will hear you.'" She complied with defendant's order and got into the car, a 2-door dark maroon sedan with bucket seats in the front. She was made to sit on the floor in the front with her head on the seat.

404

The prosecutrix testified that they drove for quite awhile, during which time they had a conversation involving "love" and "metaphysics." During the time they were driving they stopped at stop signs and stop lights, but she made no effort to get out of the car. They eventually stopped "somewhere out in open land," where there was grass on either side of the car. Defendant then told her to take her clothes off, and she got out of the car and ran for about 100 feet until she was caught by defendant. He again told her to take her clothes off or he would rip them off, and she complied. He then told her to get in the back seat, and they had sexual intercourse. She made no effort to resist him. They got dressed and went into the front seat, where defendant grasped her neck and said, "You are going to do what I tell you to do," and forced her to engage in an act of oral copulation as they were driving. They then stopped and defendant told her she could get out and go home. She got out of the car and they kissed goodby, defendant telling her that she was a real good girl and that if she went to the police they would take her to a hospital, and it might be embarrassing.

The prosecutrix was let out of the car near 79th and Kedzie, and at about 10:30 p. m. she entered a Chicago fire station in that vicinity to call her father. She told a fireman on duty that she had been raped. The police came to the fire station, and she was taken home and then to Holy Cross Hospital. Later that night she was taken to a police station, where she identified defendant.

The prosecutrix was extensively cross-examined. She said that she was about the same height as the defendant and weighed about 138 pounds. She never gave defendant permission to have intercourse with her, and in response to the question, "You made no physical resistance as such when he was having relations?," she an-

swered, "I didn't know how. I didn't know what to do. . . . I never had any training, nobody told me anything. All they said, don't get into a situation like this, but nobody ever told me what to do if I got into a situation." In response to the question, "Wouldn't your natural instincts tell you to do something?," she answered, "I don't know what to say to that."

The State's witnesses included Peter T. Murphy, a Chicago fireman, and Police Officers Allman and O'Driscoll. Fireman Murphy testified that about 10:30 p. m. he was on duty in a fire station at 8026 South Kedzie. It was raining, and the prosecutrix walked into the station and asked to use a telephone. He asked her if something was wrong, and she said, "Well, I just want to call my father." She was a little nervous, so he asked her if he could help her, and she said she had been raped. Officer Allman testified that he answered a call at the fire station. He took the prosecutrix home and then drove her and her mother to Holy Cross Hospital. Officer O'Driscoll testified that the prosecutrix gave him defendant's credit card, which she found in the car, and then arrested defendant in his home.

It was stipulated that Dr. Smalley, if called to testify, would testify that he conducted an examination of the prosecutrix on September 18, 1967, and that spermatozoa was found in a smear test. It was also stipulated that there were no marks or bruises on the body of the prosecutrix, nor any torn clothing.

Defendant testified that he stopped his car where the prosecutrix was walking. He asked her name and where she was going, and she told him she was going to meet her boyfriend. He asked her if she wanted to take a ride with him. She said, "What do you want to do?," and he said, "Just drive around." She said, "All right," and got in the car. He had no gun at the time and did not use physical force to get her in the car.

Defendant said that when she got in the car she mentioned that she hoped no one who knew her would see her do this, so he suggested she get down on the floor. As they were driving he stopped many times, but she never attempted to get out of the car. They traveled for a period of thirty-five or forty minutes, during which time they discussed love, religion and metaphysics. He told her that he wanted to make love to her and that he could teach her something about love, and she said, "No, you can't. I know already." She then asked him if he was married, and he said no. When he stopped the car he kissed her, but she ran out of the car and stopped and turned around. She had a pleasant look on her face and walked back to the car with him of her own free will. He did not drag her and used no force, and while they were having sexual intercourse she in no way resisted him and, in fact, was receptive.

When they were finished they drove back to a residential area close to Ford City. She made no attempt to get out of the car when they made stops. When they arrived in the area she kissed him and left. He told her that she had been very, very enjoyable that evening, and that he had enjoyed her company immensely and also her conversation. She mentioned that her father would be angry because she was arriving home so late, and that "she would tell him that somebody forcefully picked her up in a car." He told her not to do so because her father would call the police and she would be taken to a hospital, where there would be embarrassment.

Defendant's wife, Elyce Taylor, testified she had been married to defendant for seven years and they had three children with "one on the way." She said that when the police came to arrest defendant at their home, he was in a bedroom, undressed. The police searched the premises for a gun, but her husband did not have one and she never saw him with a gun.

407

Initially considered is defendant's contention that the State failed to prove venue. Defendant argues that the prosecutrix testified that she was picked up by the defendant in the Ford City parking lot, and that she did not state that the parking lot was in Cook County. Also, she said that she entered defendant's car at approximately 8:30 and entered the fire station at approximately 10:30 or 11:00. She further stated that defendant drove on a dirt road to some open land, where the intercourse took place. Defendant asserts that "within an hour [he] could have driven to Will, Kendall, Lake or DuPage County." On this point the record shows the following:

Mr. Van Zeyl: "State rests its case in chief subject to a stipulation from counsel as to the age of the defendant and all of the events occurring in the City of Chicago, County of Cook and State of Illinois."

Mr. Kalena: "Would you step up here, Mr. Taylor?"

The Court: "What is the age of the defendant?"

The Defendant: "30."

The Court: "Stipulate the defendant is 30, stipulate all of the events occurred in the State of Illinois."

Mr. Kalena: "This is off the record."

The Court: "We will adjourn until 11:00 tomorrow morning."

Defendant states that when the trial resumed there was no mention of the stipulation, and "nowhere in the record does the counsel for the defendant agree to stipulate that the events testified occurred in Cook County, Illinois," and it was necessary that "the State prove be-

yond a reasonable doubt that the alleged rape took place in Cook County, Illinois, as alleged in the indictment."

██ We find the evidence here was sufficient to show beyond a reasonable doubt that the offenses took place within the boundaries of Cook County. The prosecutrix testified that she was in the vicinity of the Ford City parking lot when she was picked up, and that she was dropped off in the vicinity of 79th and Kedzie. This court will take judicial notice of the fact that both locations are in Cook County, Illinois.

Next considered is defendant's contention that the testimony of Fireman Murphy as to the prosecutrix telling him she had been raped was prejudicial hearsay. Defendant argues that her statement was not spontaneous but was elicited from her after two or three questions by the witness as to what had happened. Authorities cited include People v. Fryman, 4 Ill2d 224, 122 NE2d 573 (1954), and People v. Szybeko, 24 Ill2d 335, 181 NE2d 176 (1962). In People v. Szybeko, it was stated (p 339) :

> "Evidence that the prosecutrix made a complaint soon after the commission of the offense is indeed accepted for the purpose of corroborating her testimony, but to be admissible and to have corroborative value, the complaint must have been made voluntarily and not in response to questions and answers, and must have been a spontaneous outburst or expression of the prosecutrix's outraged feelings, rather than a mere recital of past events."

██ It is our opinion that the statement made by the prosecutrix immediately following the occurrence qualified as a spontaneous declaration, and it was admissible in full, including its corroborative value. The fact that the fireman asked the prosecutrix "if something were wrong" and "if I could help," was insufficient to destroy

409

its spontaneity and it comes within the guidelines of People v. Damen, 28 Ill2d 464, 193 NE2d 25 (1963), where it is said (p 472) :

> "The fact that the officer asked complainant 'what happened' is, we believe, insufficient to destroy its spontaneity. People v. Harrison, 25 Ill2d 407.

> "A second class of cases exists in which the complaints of rape victims have been admitted as corroborative statements. While statements qualifying under this rule may also be admissible as spontaneous declarations, statements by the prosecutrix as to what occurred, which are made at a time too remote to qualify as spontaneous declarations, a sufficient opportunity for 'reflection and invention' having intervened, may gain admission hereunder. . . . The basis of their admission is that it is entirely natural that the victim of forcible rape would have spoken out regarding it, and the fact that she did not do so would in effect be evidence of the fact that nothing violent had occurred. If proof of such complaints were not permitted, the judge or jury might naturally assume that no complaint was made, and it is for that reason the prosecution is allowed to forestall this assumption by showing that the woman was not silent and that a complaint was in fact made. Under the early rule of hue-and-cry, it was necessary that the complaint should have been freshly made, and many courts, in enunciating the modern rule, state that the complaint must have been recent in order that the fact of its making may be admitted. . . . Our decisions have generally required that the complaint be promptly made, . . . but we have also admitted proof of complaints made some two months following the occurrence where the interval of delay was satisfactorily explained."

410

We hold that the testimony of Peter Murphy was properly admitted in full.

Finally considered is defendant's contention that he was not proved guilty beyond a reasonable doubt, and that the testimony of the prosecutrix was not clear and convincing and was totally uncorroborated. He argues that the State failed to prove that the act of sexual intercourse admitted by defendant was by force and against the prosecutrix's will. He notes that the only testimony that defendant had a gun was by the prosecutrix, and that she admitted that she did not see a gun. Also, there was no testimony that she received any threats of bodily harm or death after she entered the car, but that on the contrary the parties carried on a friendly conversation pertaining to love and metaphysics.

Defendant maintains that the following facts tend to show lack of force being used: (1) the failure of the police to find a gun in the possession of defendant; (2) the lack of bruises on the prosecutrix and the absence of torn clothing; (3) the testimony of the prosecutrix that she removed her clothing and got into the back seat herself; (4) the failure of the prosecutrix to resist or cry out during the act of sexual intercourse; (5) the impossibility of having sexual intercourse in a car with bucket seats without the help of the prosecutrix; and (6) the kiss the prosecutrix gave defendant upon their parting. Among the authorities cited are People v. Faulisi, 25 Ill2d 457, 185 NE2d 211 (1962); People v. Rossililli, 24 Ill2d 341, 181 NE2d 114 (1962); People v. Meyers, 381 Ill 156, 44 NE2d 870 (1942); and People v. Szybeko, 24 Ill2d 335, 181 NE2d 176. In People v. Faulisi, it is said (p 461):

"When the charge is forcible rape, the fact that the act of intercourse was performed forcibly and against the will of the complaining witness is a necessary element of the crime which must be proved

411

beyond a reasonable doubt. The degree of force exerted by the defendant and the amount of resistance on the part of the complaining witness are matters that depend upon the facts of the particular case. Thus we have held that resistance is not necessary under circumstances where resistance would be futile and would endanger the life of the female as where the assailant is armed with a deadly weapon, and that proof of physical force is unnecessary if the prosecuting witness was paralyzed by fear or overcome by superior strength of her attacker. . . . It is, however, fundamental that in order to prove the charge of forcible rape there must be evidence to show that the act was committed by force and against the will of the female, and if she has use of her faculties and physical powers, the evidence must show such resistance as will demonstrate that the act was against her will."

In People v. Szybeko, it is said (p 339):

"While it is firmly established that the uncorroborated testimony of a prosecutrix may be sufficient to convict if clear and convincing, . . . it is equally well settled that where her testimony is not of such clear and convincing character, and the defendant denies the charge, her testimony should be corroborated by other evidence, facts or circumstances in the case."

The State argues that the question of whether force was used was a matter for the determination of the trial court. It notes that whether or not defendant had a gun was immaterial, because it was sufficient to show that defendant wanted the prosecutrix to believe he had a gun. It also argues that defendant's testimony was improbable and unconvincing, pointing out that it is incredible that the prosecutrix, who was going to meet

412

her boyfriend, would voluntarily change her plan and enter the car with a stranger; also, that it is incredible that the prosecutrix, after telling defendant that she had to be home by 10:00 p. m. would ask to be let off at 10:10 in rainy weather, far enough from her home to require carfare. Among the authorities cited are People v. Hill, 102 Ill App2d 77, 243 NE2d 491 (1968) ; People v. Jackson, 103 Ill App2d 209, 243 NE2d 551 (1968) ; and People v. Gray, 106 Ill App2d 110, 245 NE 2d 626 (1969). In People v. Jackson, the court said (p 218) :

> "Defendant argues that to prove the crime of rape against a female who has the use of her powers and faculties, the evidence must show such resistance as will demonstrate that the act was against her will; . . . . There is, however, no set and definite standard as to the degree of force or amount of resistance required. It is a determination which must be made from the facts and circumstances of each case. . . . It is true that when the alleged victim retains the power to resist, voluntary submission, no matter how reluctantly yielded, amounts to consent. . . . On the other hand, resistance is not necessary under circumstances where resistance would be futile and endanger the life of the female, as where the defendant is armed with a deadly weapon. Likewise, resistance is not necessary where she is so overcome by superior physical strength or paralyzed by fear that she would be powerless to resist her assailant."

See, also, People v. Smith, 32 Ill2d 88, 203 NE2d 879 (1965).

We conclude the guidelines to be used on "failure to resist" or "voluntary submission" must be determined "from the facts and circumstances of each case."

413

We think this case takes its tone from its inception. Defendant admitted the acts of intercourse and deviate sexual assault. In fact, defendant freely supplied many additional details of his own deviate conduct. The only substantial difference between the testimony of the prosecutrix and the defendant is what happened initially. An analysis of the testimony of the prosecutrix shows that she entered the car under the belief that the defendant was pointing a gun at her, and if she did not obey his instructions he would shoot her. There was no evidence that defendant at any time struck or attempted to strike her if she did not have intercourse with him or engage in oral copulation. The prosecutrix explains her failure to resist physically by testifying that she didn't know what to do because she never had any training and "nobody told me anything." When asked whether her natural instincts told her to do something, she replied, "I don't know what to say to that." The testimony of Fireman Murphy as to her statement that she had been raped indicates it was sufficiently spontaneous to be used in corroboration of her testimony.

The record demonstrates that although the prosecutrix was somewhat naive, there appears to be no reason for regarding any of her testimony as unworthy of belief. The credibility of her testimony was a matter for the trial judge, and the record shows that he paid particularly close attention to it and at several points had her testify in his chambers so as to avoid further embarrassment. In finding defendant guilty of the offenses charged, the trial judge remarked: "Under the facts, there will be a finding of guilty. Here is a girl sixteen years of age, and I believe her story that she was forced into the automobile against her will and that she was in fear. She said that the man said, 'I will shoot you if you don't get in,' and from there on in we had a young girl in fear and any will that she might have to

overcome the sexual appetite of this man and what he testified to before me—a thirty-year-old man talking about love and religion. He was a wolf in sheep's clothing all the way through this. Is there anything you have here in aggravation? . . . Well, it's a very serious case, now the only saving feature of this case is that the girl wasn't hurt in any way and that he didn't strike her, that might be, but he surely overcame her will under all of the evidence here and this sixteen-year-old girl, I have to look at this in the light of her age, this is a good girl, so the persons who really are being punished here are the wife and the children and the expected child. We had a salesman who was selling his wares to the young girl in this case; so the sentence will be eight to twenty. You are hereby sentenced to Illinois State Penitentiary for a minimum of eight years and a maximum of twenty years."

■ In a bench trial in a criminal case, the question of the credibility of the witnesses and the weight to be given their testimony is for the trial judge. "Where the truth lies, in any debatable set of circumstances, is a matter peculiarly for the determination of the trier of fact, be it judge or jury, and it is not for a reviewing court to substitute its opinion therefor." In view of the opportunities of observation available to the trial court, its judgment should not be set aside by a reviewing court unless the proof is so unsatisfactory or implausible as to justify a reasonable doubt as to defendant's guilt. People v. Woods, 26 Ill2d 582, 585, 187 NE2d 692 (1963); People v. Hill, 61 Ill App2d 16, 23, 208 NE2d 874 (1965); People v. Banks, 116 Ill App2d 147, 155, 253 NE2d 631 (1969).

■ Applying that test here, we hold that the trial court was presented with sufficient satisfactory and plausible proof on which to find defendant guilty of

both offenses beyond a reasonable doubt. Therefore, for the reasons given, the judgment of the Circuit Court is affirmed.

Affirmed.

BURMAN, P. J. and ADESKO, J., concur.